**In re BNT TERMINALS, INC., Debtor.**

**Nathan YORKE, not individually but solely as Trustee of the Bankruptcy Estate of B.N.T. Terminals, Inc., Plaintiff,**

**v.**

**CITIBANK, N.A., the Home State Bank of Kansas City, Kansas, Commerce Bank of Kansas City, N.A., Shopko Stores, Inc., Norwest Bank, N.A., Metro Title & Escrow Company, Chicago Title & Trust Company, Marvin Juron, Juron, Pauker & Rubin, Ltd., Harry F. Chaddick Realty, Inc., Vicar Insurance Agency, Inc., and First American Title Insurance Company, Defendants.**

**Bankruptcy No. 85 B 13006.**
**Adv. No. 87 A 1232.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Nov. 15, 1990.

Amended Opinion Feb. 21, 1991.

Richard J. Mason and John F. Pollick, of Ross & Hardies, Chicago, Ill., for plaintiff.

Benjamin D. Schwartz, of Altheimer & Gray, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

JOHN D. SCHWARTZ, Chief Judge.

This matter comes before the court on the motion of plaintiff Nathan Yorke, Trustee ("Trustee"), for partial summary judgment and the cross-motion of the defendant, Home State Bank of Kansas City ("Home State"), for summary judgment. For the reasons set forth herein, the court, after considering the pleadings, exhibits, and memoranda filed, does hereby grant the Trustee's motion for partial summary judgment and denies Home State's motion for summary judgment.

## I. JURISDICTION AND PROCEDURE

The court has jurisdiction to entertain this motion pursuant to 28 U.S.C. § 1334 and General Orders of the United States District Court for the Northern District of Illinois. The motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).

## II. STANDARD FOR SUMMARY JUDGMENT

In order to prevail on a motion for summary judgment, the moving party must meet the statutory requirements set forth in Rule 56 of the Federal Rules of Civil Procedure. This rule is applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. *See* Fed.R. Civ.P. 56.

Summary judgment is appropriate only if there remain no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1339 (7th Cir.1985). If a nonmoving party fails to establish an element essential to his case on which he carries the burden of proof, summary judgment is proper. *Samuels v. Wilder*, 871 F.2d 1346 (7th Cir.1989). The facts alleged by the movant must be such that the court can reasonably conclude on a preponderance of the evidence that the movant is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## III. UNDISPUTED FACTS AND BACKGROUND

On October 1, 1985, BNT Terminals, Inc. ("BNT") filed a voluntary petition under Chapter 11 of the Bankruptcy Code ("Code")[1] and served as a debtor-in-possession until May 21, 1987. At that time the court entered an order converting BNT's case to one under Chapter 7. On June 4, 1987, Nathan Yorke was appointed trustee.

A few months prior to BNT's filing bankruptcy, one of its principal officers instigated a series of financial transfers which resulted in the dispute currently before the court. Avery Eliscu ("Eliscu"), BNT's principal officer, used BNT assets to secure an indebtedness of $1,471,018.33 in personal loans owed to Citibank N.A. ("Citibank"). (This loan is hereinafter referenced as "$1,500,000 Personal Loan.") Although BNT assets were used to secure this $1,500,000 Personal Loan, BNT re-

**1.** 11 U.S.C. §§ 101 *et seq.* All section references are to the Code.

ceived no benefit directly or indirectly from the transaction.

Two of BNT's assets that were given as security for the $1,500,000 Personal Loan were truck terminals, one located in Peoria, Illinois ("Peoria Terminal"), and the other one located in Omaha, Nebraska ("Omaha Terminal"). When the security was given to Citibank around July 1, 1985, the terminals were already subject to liens so that BNT granted Citibank a second lien in each asset. Specifically, BNT granted to Citibank a second mortgage and an assignment of rents in the Peoria Terminal ("Peoria Mortgage"). Regarding the Omaha Terminal, BNT granted to Citibank a second deed of trust and an assignment of rents ("Omaha Encumbrance").

Within three months, Eliscu gave Citibank a mortgage on his home as additional collateral, and Citibank agreed to release its liens on the Peoria and Omaha Terminals. For unknown reasons, Leonard Lewensohn ("Lewensohn"), a principal of BNT, instructed Citibank to assign the Peoria Mortgage and Omaha Encumbrance to Home State rather than release the liens on the BNT assets. Citibank complied with Lewensohn's instructions and assigned the liens on September 30, 1985. The note representing the $1,500,000 Personal Loan made by Citibank and secured by the Peoria Mortgage and Omaha Encumbrance ("Liens") was not released by Citibank nor was it assigned to Home State as the assignee of the Liens.

The assignment of the Liens to Home State was ostensibly to secure Home State's $250,000 loan to yet another Eliscu company, Federal Transport, Inc. ("Federal"). Home State never attempted a modification of the Peoria and Omaha lien documents to reflect that they were meant to secure Home State's $250,000 loan to Federal. On October 1, 1985, the day after Citibank's assignment of the Liens to Home State, BNT filed for Chapter 11 bankruptcy. The recording of the assignment of the Liens took place after October 1, 1985.

Crucial to the chain of events is the post-petition sale of the Omaha Terminal.

Four months (March 15, 1985) before granting Citibank the Liens on the Peoria and Omaha Terminals, BNT entered into a lease with Shopko Stores, Inc. ("Shopko") for the Omaha Terminal. The lease granted Shopko an option to purchase the Omaha Terminal for $750,000 free of all liens and encumbrances.

On March 3, 1986, approximately five months after BNT filed bankruptcy, Shopko exercised its option to purchase the Omaha Terminal. Shopko was offered a $50,000 price reduction if it closed the purchase by April 1, 1986, which it did. On April 2, 1986, BNT conveyed by warranty deed fee simple title to the Omaha Terminal to Shopko. The transfer was closed through an escrow with the Chicago Title and Trust Company ("Chicago Title"). The $630,000 was transmitted by Shopko per BNT's instructions to Chicago Title as escrowee. In connection with the closing of this sale, Home State received a payment of $257,419.80 from Chicago Title, and Home State then released its purported interest in the Omaha Terminal. However, Home State did not release its purported interest in the Peoria Terminal although both liens were alleged to have secured only one $250,000 loan. At no time was bankruptcy court approval sought or obtained for the sale of the Omaha Terminal to Shopko or the disposition of the sale proceeds, including the payment of $257,419.80 to Home State. (Needless to say, no approval was ever obtained to record the assignment of Liens to Home State.)

The Trustee filed a adversary complaint against Home State and others on December 29, 1987, seeking to recover the cash proceeds from the Omaha Terminal's sale. The Trustee received $600,000 in joint settlement from Shopko and Chicago Title. The settlement agreement provides that if the Trustee makes any further recoveries from other defendants, he will pay to Chicago Title an amount equal to one-half (½) of the amount recovered less: (a) $35,000; (b) the Trustee's costs and legal expenses incurred in prosecuting claims against the other defendants; and (c) amounts of secured claims imposed by the court on the

amounts recovered from the other defendants or another parcel of real estate.

## IV. DISCUSSION

The Trustee asks the court to declare that Home State does not now, nor ever did, have any interest in the Peoria Mortgage and Omaha Encumbrance.[2] Additionally in Count IV, relative to Shopko's purchase of the Omaha Terminal, the Trustee requests the court to void the $257,419.80 transfer of funds from the escrow to Home State as violative of the automatic stay. In the alternative, the Trustee seeks to avoid the transfer under § 549 as it occurred post-petition and thus recover the amount transferred under the powers granted him by § 550. The Trustee requests a judgment against Home State in the amount of $257,419.80, plus interest from the date of the transfer to the date of judgment, and the costs and attorney's fees of this action. The Trustee has now moved for summary judgment.

Home State raises several affirmative defenses to the Trustee's Motion for Partial Summary Judgment. Specifically, Home State argues that the relief the Trustee requests is barred pursuant to §§ 549(d), 550(b)(1), 550(c), the doctrine of laches, the doctrine of unclean hands, and the Trustee's failure to join Federal as a party defendant. Home State alleges in its Cross Motion for Summary Judgment that the Trustee may not void the transfer under § 362 or avoid the transfer under § 549 because the funds were not property of the estate.[3] Finally, Home State claims that the transfer is avoidable, if at all, under § 549 and not § 362.

Prior to addressing the issues raised by the Trustee, the court must first determine whether the issue is properly before the court. Thus, in order to pass the jurisdictional threshold the court must determine whether the cash deposited by Shopko was property of the estate and, if so, whether the escrow operated to divest the estate of this property. It is undisputed that BNT held title to the Peoria and Omaha Terminals. These two terminals constituted property of the estate upon the commencement of BNT's bankruptcy. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203–6, 103 S.Ct. 2309, 2312–14, 76 L.Ed.2d 515 (1983); *In re Jones*, 768 F.2d 923, 926–27 (7th Cir.1985); *In re Galvan*, 110 B.R. 446, 449 (9th BAP 1990). Shopko deposited the purchase price into the escrow established for the purpose of purchasing the Omaha Terminal from the debtor BNT. BNT deposited the deed. The cash proceeds realized from the sale constituted no more than a change in form of estate property. *In re Bridge*, 90 B.R. 839, 845–46 *on rehearing* 106 B.R. 474 (Bankr.E.D.Mich.1988) (proceeds of sale of debtor's ranch are property of the estate). Home State argues, however, that the use of the escrow divested the estate of any property interest in the purchase price.

Even though the Code creates an estate of all property of the debtor, wherever located and by whomever held, the language of § 541(a)(1) only identifies the interest transferred to the estate; it does not address the threshold question of the existence of an interest or the scope of the debtor's interest in a given asset. *In re Farmers Markets, Inc.*, 792 F.2d 1400, 1402 (9th Cir.1986); *Esselen Associates, Inc. v. Crysen/Montenay Energy Co.*, 102 B.R. 25, 28 (S.D.N.Y.1989). The court must look to nonbankruptcy law to deter-

---

**2.** The Trustee's adversary complaint Count II and III requests the court to avoid the transfer under §§ 549 and 550. Trustee's Motion for Partial Summary Judgment modifies the relief requested. The Trustee now claims that Home State did not retain any legal or equitable interest in the assignment of the terminals by Citibank and so requests the court to make such a finding.

**3.** BNT instructed the escrowee, Chicago Title, to pay certain sums to specified entities after Shop-

ko deposited $630,000 and the Title Insurance Company of Minnesota made a commitment. Home State received $257,419.80 from the escrowee, as per the escrow instructions.

Home State claims the payment of $257,419.80 was not property of the estate under § 541 because BNT never retained physical possession of the funds in escrow. Rather, Home State claims the funds immediately vested in the intended recipients when Shopko deposited the purchase price in escrow.

mine the extent and scope of any interest, if existing. *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1343 (7th Cir.1987); *In re Del Grosso*, 111 B.R. 178, 181 (Bankr.N.D.Ill.1990). In *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), the U.S. Supreme Court addressed the application of state law in defining property interests:

> "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'" (citations omitted)

The present issue involves a transfer consummated in the state of Illinois. Therefore, the court must look to Illinois law to determine whether the escrow somehow operated to divest BNT of any interest in the funds deposited into the escrow by the purchaser as the required purchase price.

■■■ An escrow is any written instrument which by its terms imposes a legal obligation, and which is deposited with a third party, to be held by the depositary until certain conditions have been performed. *Johnson v. Wallden*, 342 Ill. 201, 173 N.E. 790, 792 (1930). Illinois courts treat an escrow document as merely an auxiliary instrument created to help implement or execute a primary agreement with its ordinary function to give security to both parties to the existing transaction; it is not a substitution for the original contract nor does it purport to change the parties interest. *Hakala v. Illinois Dodge City Corporation*, 64 Ill.App.3d 114, 21 Ill.Dec. 1, 6, 380 N.E.2d 1177, 1182 (2nd Dist.1978). An escrowee, like a trustee, therefore, owes a fiduciary duty to the parties to the escrow agreement to act only

according to the terms of the escrow instructions. Absent privity, a party may not sue to enforce a breach of an escrow trust agreement. *Bescor, Inc. v. Chicago Title & Trust Company*, 113 Ill.App.3d 65, 68 Ill.Dec. 812, 446 N.E.2d 1209, 1213 (1st Dist.1983).

■■ BNT's escrow agreement operated as a mere ancillary document to the sale of the Omaha Terminal to Shopko. The escrow provided security for BNT as well as for Shopko by permitting the transfer of title only upon the happening of specified events. BNT deposited title in escrow. Shopko deposited the purchase price. The escrowee used the sale proceeds to satisfy existing liens. Thus, the escrow provided security for both parties by allowing BNT to use the sale proceeds to satisfy liens on the Omaha Terminal while assuring Shopko title free from all such liens. At no time did the escrow alter the vesting of proceeds in BNT. Further, the facts indicate, at the very least, that BNT constructively possessed the funds for purposes of disbursement to meet its obligations under the agreement. Finally, Home State's lack of privity to the escrow document qualifies Home State, at most, as an incidental beneficiary of the escrow agreement. 68 Ill. Dec. at 816, 446 N.E.2d at 1213. Therefore, under Illinois law, the escrow did not operate to divest the estate of its interest in the cash proceeds from the sale of the Omaha Terminal.

■■ In addition to Illinois state law, the Bankruptcy Code treats the funds deposited with the escrowee as property of the estate. Specifically, § 541(c)(1) provides in pertinent part as follows:

> (c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—
>
> (A) that restricts or conditions transfer of such interest by the debtor; or ... (citations omitted)

Assuring all property is transferred to the estate for orderly distribution, property subject to restrictions on transfer remains property of the estate notwithstanding such restrictions. *In re Farmers Markets, Inc.*, 792 F.2d at 1402 (Section 541(c)(1)(A) avoids those restrictions preventing the transfer of debtor's property to the estate). Thus, even if the escrow document attempted to restrict the vesting of funds to BNT's estate, those restrictions would be unenforceable given the facts of this case. The money deposited in escrow was to secure the transfer of property of the estate to a third party and nothing more.

■ Home State claims that the "earmarking" doctrine applies. This contention barely merits a response by the court. The "earmarking" doctrine only applies where funds are loaned or given to a debtor which are intended for a particular creditor. Such funds are deemed to have never been the property of the debtor because the debtor never had control of them. *In re Hartley*, 825 F.2d 1067, 1070–71 (6th Cir. 1987).

Shopko did not give or loan funds to BNT, but rather paid BNT for the purpose of the Omaha Terminal. The purchase price was deposited in the escrow and was to be paid out as the escrow instructions permitted. Home State misinterprets the purpose of the escrow. As previously explained, the purpose of the an escrow is two fold, to allow the seller to use the proceeds of the sale (purchase price) to pay off liens, and to see that the purchaser obtains a clear title. The seller is using the money that the seller is entitled to receive. If the lien was paid by the seller from other funds or voluntarily released, then all the cash proceeds would be delivered to the seller. Last but not least, the sale price was not reduced by the amount paid to Home State. Thus, the court finds that the sale proceeds constituted property of the estate and the escrow did not operate to somehow divest the estate of property that became property of the estate upon the commencement of the case.

■ Did Home State have an interest in the Peoria Mortgage or Omaha Encumbrance? It is hornbook law that a mortgage follows the debt it secures. 59 C.J.S., Mortgages § 356 (1949); 55 Am. Jur.2d, Mortgages § 1283 (1971). An assignment of a mortgage without a transfer of the underlying note is a nullity. *Id.* However, the court must look to state law to determine the nature of the interest, if any, acquired by Home State under the assignments even though the assignments were not recorded prior to the commencement of the case.[4] *United States v. Goldberg*, 362 F.2d 575, 576 (3rd Cir.1966) (nature of interest acquired under an assignment of a mortgage must be determined by state law).

■ The Illinois and Nebraska courts treat a mortgage as incident or accessory to the debt, *Krueger v. Dorr*, 22 Ill.App.2d 513, 161 N.E.2d 433, 440–41 (2nd Dist. 1959); *State Bank of O'Neill v. Mathews*, 45 Neb. 659, 63 N.W. 930 (1895), and, an assignment of a mortgage without the note as a nullity. *Moore v. Lewis*, 51 Ill.App.3d 388, 9 Ill.Dec. 337, 342, 366 N.E.2d 594, 599 (1st Dist.1977); *Webb v. Hoselton*, 4 Neb. 308, 318 (1876). In order for the Illinois or Nebraska courts to enforce a mortgage assignment, the assignor must assign the underlying debt secured by the mortgage debt. *Lundy v. Messer*, 25 Ill.App.2d 513, 167 N.E.2d 278, 279 (2nd Dist.1960); *Tilden v. Beckmann*, 203 Neb. 293, 278 N.W.2d 581, 586 (1979). It is axiomatic that any attempt to assign the mortgage without transfer of the debt will not pass the mortgagee's interest to the assignee. *Commercial Products Corporation v. Briegel*, 101 Ill.App.2d 156, 242 N.E.2d 317, 321 (3rd Dist.1968); *Webb v. Hoselton*, 4 Neb. at 318.

**4.** The parties did not address the trustee's avoiding powers under § 544(a)(3), the court notes that Home State's failure to record the assignments prior to the commencement of the case would allow the trustee to avoid the transfer under the "strong arm" provision of § 544. However, the court finds it unnecessary to discuss this issue since an alternative position by the Trustee is dispositive of the issue.

■ BNT granted Citibank a second lien and assignment of rents on the Peoria and Omaha Terminals to secure the $1,500,000 Personal Loan. Upon Eliscu providing additional collateral sufficient to secure a release, Citibank assigned the Liens to Home State at Lewensohn's request. Citibank did not and never intended to assign the underlying debt which the Peoria Mortgage and the Omaha Encumbrance secured. Therefore, the assignments by Citibank to Home State assigned nothing.[5] More significantly, the court finds that Home State does not now, nor did it ever, retain or have an interest in the Peoria Mortgage or Omaha Encumbrance pursuant to the assignments by Citibank. To hold otherwise would make a mockery of the law.

■ Home State claims without citing any statutory or case authority that it possessed an equitable mortgage in the Peoria and Omaha Terminals. An equitable mortgage is a lien upon property to secure payment of money which lacks the essential features of a legal mortgage, either because it grows out of a transaction between the parties without any deed or express contract to give a lien, or because the instrument used for that purpose is lacking some of the characteristics of a common-law mortgage. As explained, the purported assignment failed to convey any legal or equitable interest, thus Home State has no equitable mortgage in either property.

Did Home State violate the automatic stay? BNT commenced a voluntary petition under Chapter 11 on October 1, 1985. On March 3, 1986 Shopko elected to exercise its option to purchase the Omaha Terminal. The transfer was consummated through an escrow on or around April 2, 1986. No court approval was obtained. Home State received payment of $257,419.80 without court approval. The whole transaction is tainted including the payment of over a quarter of million dollars to Home State which the Trustee claims violated the automatic stay.

■ It is well accepted that the automatic stay not only protects the debtor's attempt to repay his debts or reorganize his financial affairs by giving the debtor a respite from creditor demands, *In re Parr Meadows Racing Assn.*, 880 F.2d 1540, 1545 (2nd Cir.1989); *In re Ionosphere Clubs, Inc.*, 105 B.R. 765, 771 (S.D.N.Y. 1989), but it also protects creditors by preventing dismemberment of the estate. *Martin–Trigona v. Champion Federal Savings and Loan Asso.*, 892 F.2d 575, 577 (7th Cir.1989); *In re Sky Group International, Inc.*, 108 B.R. 86, 89 (Bankr.W.D. Pa.1989). Purposely, the automatic stay maintains the status quo, to ensure an orderly distribution of estate assets, *In re Vitreous Steel Products Co.*, 911 F.2d 1223, 1231–32 (7th Cir.1990); *In re Dohm*, 14 B.R. 701, 702 (Bankr.N.D.Ill.1981), and, more importantly, facilitate the administration of the estate by allowing the court to resolve claims and distribute assets in accord with priorities recognized in the Code. *Vitreous Steel Products Co.*, 911 F.2d at 1231–32. The majority of Circuit Court cases hold that acts in violation of the automatic stay are void and without effect. *In re Calder*, 907 F.2d 953, 956 (10th Cir. 1990); *In re Taylor*, 884 F.2d 478, 483 (9th Cir.1989); *In re Smith*, 876 F.2d 524, 525–26 (6th Cir.1989); *In re Ward*, 837 F.2d 124, 126 (3rd Cir.1988). The court will not tolerate unauthorized acts by debtors or creditors by allowing possession of, or facilitating the exercise of control over, or permitting the dismemberment of property of the estate outside the provisions of the Code. To do so would make a nullity of § 362 and what it attempts to accomplish as well as invite horrendous fraud upon the court.

■ It is undisputed that the parties participating in the sale of the Omaha Terminal failed to obtain court approval for the sale. Also undisputed is the fact that no party sought court approval to distrib-

---

**5.** The court's order dated November 14, 1989 in 87 A 1232 found that the purported assignment by Citibank of the Peoria Mortgage to Home State was ineffective due to Citibank's failure to assign the underlying debt.

ute the sale proceeds. Thus, the sale and subsequent transfer of sale proceeds violated the automatic stay and are without effect. *In re Calder*, 907 F.2d at 956; *In re Taylor*, 884 F.2d at 483; *In re Smith*, 876 F.2d at 525–26; *In re Ward*, 837 F.2d at 126.

▮ Home State argues that its conduct did not violate the automatic stay and that it is not liable for violating the automatic stay due to the voluntary acts of BNT in transferring the funds in question. Home State also argues that the Trustee has no right to void the transfer under § 362 of the Code but rather must avoid the transfer, if at all, under § 549 and § 550. Home State relies on dicta in *In re Garcia*, 109 B.R. 335 (N.D.Ill.1989) to support both propositions.

In *Garcia*, a tax lien creditor sold debtors' property post-petition at an unauthorized tax sale. The assignee of the purchaser filed a turnover request with the court nearly three (3) years after the sale. The Trustee objected and claimed the post-petition sale was void as violating the automatic stay. The purchaser argued that § 549 applied and that he was entitled to the property since the sale occurred post-petition and since the Trustee did not object within two (2) years of the transfer. 109 B.R. at 336.

In reconciling § 549 and § 362 the court in dicta stated that a distinction must be made between the act prohibited by the automatic stay, acts not authorized by the Bankruptcy Code, and the debtor's role in the transfer. 109 B.R. at 339. In viewing the facts, the *Garcia* court concluded that § 362 applied and the post-petition sale void ab initio. 109 B.R. at 340.

Looking at the facts and legal reasoning in *Garcia*, it is obvious that Home State overlooked the essential element involved in determining whether a post-petition transfer is void under § 362. The crucial element involves the timing of the alleged transfer.

*Richard v. Chicago*, 80 B.R. 451 (N.D.Ill. 1987) more clearly explains the timing element present in *Garcia*. The *Richard* court voided a similar tax sale under § 362 and refused to avoid the transfer under § 549. There, the debtor filed bankruptcy in 1980 and in 1982 Cook County sold an overdue tax assessment at a tax sale without court approval. In 1985, Cook County issued a tax deed to the purchaser based on the 1982 tax sale, also without court approval. Immediately, the purchaser requested the court to modify the automatic stay to allow the purchaser to take possession. 80 B.R. at 452. The court held that the tax deed was invalid.

The *Richard* court observed that the automatic stay attached immediately upon the debtor filing bankruptcy. Thus, any acts against the property of the estate without court approval violated the automatic stay, and thus were void. 80 B.R. at 453. The court held that since Cook County neither vacated nor modified the automatic stay to allow the tax sale, the tax sale as well as the tax deed were void and without legal effect. 80 B.R. at 453. The court concluded that since § 549 only applies to transfers of property, and since the tax sale was void and the tax deed invalid and thus conferred no property, then § 549 did not apply. 80 B.R. at 454.

Similarly, the present facts necessitate the application of § 362 and not § 549. On October 1, 1985, the automatic stay immediately attached to the Peoria and Omaha Terminals making any subsequent disposition of the this property without court approval void. Only five (5) months after the bankruptcy filing, the sale of the Omaha Terminal was consummated without court approval. Further, in connection with the unauthorized sale, Home State received $257,419.80, also without court approval. At no time did any party to the sale of the terminal or distribution of proceeds seek to modify or vacate the automatic stay or obtain court approval. Thus, like the tax sale and granting of tax deed in *Richard*, the unauthorized sale of the Omaha Terminal and subsequent unauthorized transfer of funds violated the automatic stay and are without legal effect: void ab initio. Logically, since § 549 concerns only the transfer of estate property, and since the unauthorized sale and unauthorized trans-

fer conferred no legally enforceable interest in the estate property or resulting proceeds, then § 549 is not applicable. The Trustee need not avoid an already void transfer.

In addition to the timing of the transfer, the distribution of the quarter of million dollars to Home State is exactly the type of transfer that the automatic stay is intended to prevent. *Vitreous Steel Products Company*, 911 F.2d at 1231–32. If Home State had a legally enforceable right against the property of BNT then its proper rank among other claims is an issue for the court's determination which this court will protect. Permitting Home State to retain these funds as it would have this court do would allow Home State to receive a windfall at the expense of the creditors of this estate and the integrity of the bankruptcy system. This court will not sit idle and permit debtors to waive willy, nilly the automatic stay so that certain creditors may be preferred with impunity and the estate dismembered without reference to the Code. *In re Best Finance Corporation*, 74 B.R. 243, 245 (D.C.Puerto Rico 1987). Home State's conduct is not excusable.

Finally, the court has found nothing in the Code which permits an entity to receive or retain estate property that on its face it has no right or interest in obtaining nor has the court discovered a provision of the Code which allows the debtor to permit such a transfer. The court can not allow Home State to call as its own the property of this debtor's estate which Home State does not now, nor ever did, have an interest in obtaining. Home State's position is much akin to the purchaser of stolen goods, its rights are non-existent against the rightful owner. If the law means anything at all, Home State must disgorge the payment it received on the sale of the Omaha Terminal, and take its place among other claims against the estate that owes it the money.[6]

Home State argues that it failed to receive notice and thus it should not be held liable for violating the automatic stay. Although a lack of notice may vitiate willfulness in a contempt proceeding, it carries no weight when raised as a defense to a violation of the automatic stay. *In re Calder*, 907 F.2d at 953; *In re Young*, 14 B.R. 809, 811 (N.D.Ill.1981).

Home State can not now put its head in the sand and claim ignorance, especially when it received $257,419.80 for releasing a mortgage which had no value. A mortgage without the note is nothing at all. Thus the unauthorized transfer of $257,419.80 regardless of Home State's alleged lack of knowledge is void and without effect. *In re Smith*, 876 F.2d at 956; *Richard v. Chicago*, 80 B.R. 451, 454 (N.D.Ill. 1987); *In re Skinner*, 90 B.R. 470 (D.Utah 1988). Home State can not by any stretch of the imagination hope to make itself a bona fide purchaser.[7]

Home State claims the defenses of laches, unclean hands, and the Trustee's failure to join Federal as a party defendant.[8] The defense of laches is an equitable remedy to prevent the enforcement of a claim after a change in circumstances has occurred during an inexcusable delay by the plaintiff prior to enforcing his claim which would prejudice the defendant. *Lake Caryonah Improv. Assn. v. Pulte Home Corp.*, 903 F.2d 505, 509 (7th Cir. 1990). BNT operated as a debtor-in-possession until May 21, 1987. Shortly thereafter, on June 4, 1987, the Trustee was appointed. Less than five (5) months later, the Trustee filed this complaint. At the outside, the Trustee commenced this action less than two (2) years after the transfer occurred. The court fails to find any unexcusable delay or resulting prejudice as a result of the Trustee filing this claim less than two (2) years after the transfer. *Richard v. Chicago*, 80 B.R. 451, 455.

---

**6.** BNT was never indebted to Home State.

**7.** *Supra* n. 4, (the assignments of the Liens were recorded after the commencement of the case and thus are avoidable under § 544(a)(3)).

**8.** Home State's additional defenses concern 549(c), 549(d), 550(b)(1), and 550(c). As explained, Home State violated 362 thus it has no defenses under 549 and 550.

Home State fails to cite any authority for its unclean hands defense or explain the extent of the Trustee's wrongfulness. There is absolutely no basis in law or in fact that can sustain Home State's position and clearly equity should not do so. The court dismisses these defenses.

■ Home State further argues that the Trustee's failure to join Federal as a party defendant bars relief. Home State has failed to carry its burden by showing that Federal is needed for a just adjudication of its rights.

Finally, based on Home State's violation of the automatic stay, the Trustee requests from Home State, prejudgment interest on the funds transferred, the costs associated with pursuing this action, and attorney's fees. Whether the conduct of Home State in retaining funds in violation of the automatic stay compels this court to award prejudgment interest, and whether Home State should be assessed costs and legal expenses incurred by the Trustee is a matter that will be set for an evidentiary hearing.

## CONCLUSION

For the reasons outlined above, the court finds that Home State does not now, nor did it ever have an interest in the Peoria Terminal or in the Omaha Terminal as a result of the Citibank assignment to Home State of the Peoria Mortgage and the Omaha Encumbrance and therefore finds and determines that the receipt of the $257,-419.80 violated among other provision of the Code the automatic stay provided for under § 362 and such transfer is void ab initio. The transfer is recoverable. Finally, whether the court will award interest, costs, and legal expenses will be set for an evidentiary hearing.

## PARTIAL SUMMARY JUDGMENT ORDER

For the reasons set forth in the Memorandum Opinion of even date:

IT IS ORDERED that the motion of Nathan Yorke, Trustee in the above captioned proceedings, for partial summary judgment is granted and Home State Bank of Kansas's motion for summary judgment is denied.

IT IS FURTHER ORDERED that Home State Bank of Kansas deposit with the Trustee to be placed in a separate interest bearing account subject to further order of the court the sum of $257,419.80 within ten (10) days of the entry of this Order.

IT IS FURTHER ORDERED that whether the Trustee is entitled to prejudgment interest, costs, and legal expenses from Home State for its violation of the automatic stay will be set for a status hearing on December 6, 1990 at 9:30 a.m. at which time the court will set the time for an evidentiary hearing.

## AMENDED MEMORANDUM OPINION

Home State Bank of Kansas City ("Home State" sometimes "Defendant") has requested the Court to reconsider the Memorandum Opinion and Order of November 15, 1990, finding that Home State violated 11 U.S.C. § 362.[1] For the reasons stated below, the motion is denied.

## I. JURISDICTION AND PROCEDURE

The court has jurisdiction to entertain this motion pursuant to 28 U.S.C. § 1334 and General Rule 2.33(a) of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## II. FACTS AND BACKGROUND

All the relevant facts and background are contained in the earlier opinion of *In re BNT Terminals, Inc.*, 125 B.R. 963 Memorandum Opinion, November 15, 1990 (Schwartz, J.) (hereinafter referred to as "November Opinion"). In that decision, the Court ruled, *inter alia*, that Home State had violated the automatic stay imposed by § 362. In the accompanying order, the Court ordered, *inter alia*, that Home State deposit with the Trustee, the

---

1. 11 U.S.C. § 101 *et seq.* All section references are to the Bankruptcy Code.

sum of $257,419.80 to be placed in a separate interest bearing account. *See In re BNT Terminals, Inc.*, 125 B.R. 974, Partial Summary Judgment Order, November 15, 1990 (hereinafter referred to as "November Order"). The November Opinion and Order were entered on the docket on November 21, 1990, and accordingly became effective that date pursuant to Federal Rules of Bankruptcy Procedure 5003 and 9021. Home State's motion requesting the Court to reconsider its November Opinion and Order was filed within ten days after entry of the Court's decision.

Home State requests the Court to either reverse its November Opinion and Order and grant summary judgment in favor of the Defendant or, in the alternative, to condition the payment of $257,419.80 from Home State to the Trustee upon several conditions intended to protect the Defendant's right to assert claims in Federal Transport, Inc.'s ("Federal") separate bankruptcy proceedings and in these proceedings. Specifically, Home State requests:

(a) the reinstatement or judicial acknowledgment, as may be appropriate, of the security interest and liens that had been granted to Home State on the Great Falls Terminal, Cargo [sic] Terminal and virtually all of the personal property of Federal Transport, Inc. ("Federal Transport") pursuant to two mortgages and a security agreement including those mortgages that were released by Home State in consideration of and in reliance upon the payment to Home State;

(b) the payment to Home State by the bankruptcy trustee in the Federal Transport case of all cash or other proceeds realized from the real and personal property subject to the mortgages and security interest; and

(c) the granting of leave to Home State to file proofs of claim in the bankruptcy cases of BNT Terminals, Inc. ("BNT"), Federal Transport, or any other related bankruptcy cases as may be appropriate for the damages suffered by Home State as a result of the wrongful conduct of the Debtors and representatives of the bankruptcy estates;

In addition of the foregoing, Home State requests the Court to stay the November Order as well as clarify its procedural posture. The Court heard argument of counsel for Home State solely with respect to its request for the stay of the November Order pending the Court's ruling on Home State's motion to reconsider. The Court clarified its November Order, but left unchanged the November Opinion. *See In re BNT Terminals, Inc.*, 87 A. 1232, Order Clarifying Partial Summary Judgment Order, December 6, 1990 (hereinafter referred to as "Comfort Order").

Pursuant to the Comfort Order, the Court again directed Home State to deposit the sum of $257,419.80 with the Trustee. The Court also explained that the November Order is an interlocutory order pursuant to Bankruptcy Rule 7054. Finally, the Court stated that:

The deposit by Home State of said sum or the failure of Home State to file notice of appeal within 10 days of entry of the Partial Summary Judgment Order, this order or any order on Home State's Motion shall not constitute a waiver of, nor shall it prejudice in any way, any right or privilege of Home State, including its right or privilege to a) argue, among other things, that its liens and security interest in property of Federal Transport, Inc. be reinstated or acknowledged; b) request an accounting and turnover from the Trustee of all proceeds realized from the disposition of the real and personal property of Federal Transport, Inc.; c) request that it be authorized to file proofs of claim in both the BNT Terminals, Inc. and Federal Transport, Inc. cases; d) pursue its Motion For Reconsideration and to Amend or alter Partial Summary Judgment Order and Motion for an Order Directing the Trustee to Account and Turnover; e) appeal for the Partial Order for Summary Judgment or this Court's ruling on the Motion; or f) seek any other relief from any bankruptcy court, district court or any appellate court.

The Court took Home State's motion to reconsider under advisement.

## III. ARGUMENTS OF THE PARTIES

Home State invites this Court to re-decide the same issues the Defendant raised the first time around in its motion for summary judgment. Based upon little explanation and no new evidence, Home State contends that the Court's finding that the Defendant violated § 362 was based upon unsubstantiated and incorrect factual conclusions. Home State also disputes the Court's reliance on well-accepted case law, contending that the Court has made erroneous conclusions of law that render § 549 a nullity.

Home State first argues that the Court incorrectly concluded that Home State would have received a windfall of $257,-419.80, if allowed to keep the payment. Home State points to its release of its security interest in the Great Falls and Fargo Terminals owned by Federal, and valued at $290,000, as constituting sufficient value given in return for the $257,-419.80 payment. Home State further contends that it would have eventually received payment in full for the debt owed by Federal even if it had not received the payment of $257,419.80 from the sale of BNT's property because the Defendant was over-secured against Federal's property. Thus, the Defendant argues it would not have received a windfall if allowed to keep the payment of $257,419.80 because the Defendant would have been paid in full by Federal, eventually. Finally, Home State argues that the Court can not infer that Home State had a "guilty mind" in violating § 362 because the Defendant received the $257,419.80 payment and gave nothing in return.

The Defendant claims to have purportedly released its interest in Federal's property upon receiving the $257,419.80 payment from BNT. Thus, Home State next contends that the Court must reinstate these purported liens that it held against Federal's property if the Court is to void the transfer of $257,419.80. Home State analogizes its position to that of Norwest Bank, N.A. *See in re BNT Terminals, Inc.*, 87 A 1232, Memorandum Opinion and Order, October 5, 1989 (Schwartz, J.) (hereinafter referred to as "Norwest Opinion"). Home State argues that the Court, in that case, held that voiding the transfer of payment to creditor, Norwest Bank, would operate to reinstate the creditor's pre-existing liens. Thus, Home State argues that the Court must reinstate the Defendant's liens on the Great Falls and Fargo Terminals and on the personal property of Federal. Finally, Home State argues that the failure to add Federal as a party defendant has operated to the Defendant's detriment. Home State claims the absence of Federal prevents the Court from reinstating the Defendant's purportedly valid liens.

The Defendant finally argues that the Court made erroneous conclusions of law. Home State claims that the Court erred in observing that the language Home State relied upon in *In re Garcia,* 109 B.R. 335 (N.D.Ill.1989) was dicta. Home State further argues that the Court erred in finding that the transfer of $257,419.80 to the Defendant constituted a transfer of property of the estate. Home State has offered to file a memorandum of law to discuss this last issue and the other issues, but no memorandum of law was forthcoming.

The response of the Trustee essentially relies upon the substance of the Court's November Opinion for denying Home State's motion. Home State's untimely reply was filed February 12, 1991, and was not considered by the Court.

## IV. DISCUSSION

### A. FEDERAL RULE OF CIVIL PROCEDURE 59

■ Home State has filed a "motion for reconsideration" which is not recognized as a proper motion by either the Federal Rules of Bankruptcy Procedure or Federal Rules of Civil Procedure. Rule 59(e) of Federal Rules of Civil Procedure as adopted by Bankruptcy Rule 9023 permits a party to move the court to alter or amend a judgment entered by filing a motion captioned "Motion to Alter or Amend," not a "Motion to Reconsider." A number of courts have questioned the validity of a "motion to reconsider." *E.g. In re Alberto,* 121 B.R. 527, 528 (Bankr.N.D.Ill.1990)

("[U]nder Federal Rules of Bankruptcy Procedure and the Federal Rules of Civil Procedure, there is no such pleading as a 'motion to reconsider' . . ."); *see Sanders v. Clemco Industries,* 862 F.2d 161, 168 (8th Cir.1988). In a tempered voice, the Seventh Circuit has also expressed its displeasure with moving parties who fail to denominate their post-judgment motions under the appropriate Rule.

It would make life a good deal easier for all concerned if parties moving under Rule 59(e) would always caption such motions 'motions to alter or amend judgment,' rather than 'motion to reconsider,' and thereby dispel any doubt whether the motion is under Rule 59(e) or Rule 60(b)—rules with very different procedural consequences . . .

*A.D. Weiss Lithograph Co. v. Illinois Adhesive Products Co.,* 705 F.2d 249, 249–50 (7th Cir.1983) (per curiam).

■ Even though a motion may be incorrectly titled, the Seventh Circuit Court of Appeals has directed district courts to treat all substantive post-judgment motions filed within ten days under Rule 59. *Charles v. Daley,* 799 F.2d 343, 347 (7th Cir.1986); *accord Western Industries, Inc. v. Newcor Canada Limited,* 709 F.2d 16, 17 (7th Cir.1983) (per curiam) ("Post-judgment motions filed within 10 days should, where possible, be construed as Rule 59(e) motions . . ."). Even though the motion at bar incorrectly requests this Court to reconsider its November Opinion, Home State's motion was filed within ten (10) days of the entry of the Court's decision and does request the Court to alter or amend the judgment in addition to requesting reconsideration. Accordingly, the instant motion will be treated as filed under Federal Rule of Bankruptcy Procedure 9023.

■ Rule 59 provides a procedure whereby the Court can correct manifest errors of law or fact, or consider the import of newly discovered evidence. *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985); *Keene Corp. v. International Fidelity Insurance Co.,* 561 F.Supp. 656, 665 (N.D.Ill.

1985), *aff'd,* 736 F.2d 388 (7th Cir.1984); *F/H Industries, Inc. v. National Union Fire Insurance Co.,* 116 F.R.D. 224, 226 (N.D.Ill.1987). The Eighth Circuit in rejecting a new argument on a motion to amend quoted the Seventh Circuit:

Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during pendency of the summary judgment motion. The non-movant has an affirmative duty to come forward to meet a properly supported motion for summary judgment . . . Nor should a motion for reconsideration serve as the occasion to tender new legal theories for the first time.

*Hagerman v. Yukon Energy Corp.,* 839 F.2d 407, 414 (8th Cir.1988).

Thus, the function of a motion pursuant to Rule 59(e) is not to give the moving party another "bite of the apple" by permitting the arguing of issues and procedures that could and should have been raised prior to judgment. *F.D.I.C. v. Meyer,* 781 F.2d 1260, 1268 (7th Cir.1986); *Ray E. Friedman & Co. v. Jenkins,* 824 F.2d 657, 660 (8th Cir.1987); *American Home Assurance Co. v. Glenn Estess & Associates, Inc.,* 763 F.2d 1237, 1239 (11th Cir.1985); *Willens v. University of Massachusetts,* 570 F.2d 403, 406 (1st Cir.1978); *Evans Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 244 (N.D.Ill.1976). A motion brought under Rule 59(e) is not a procedural folly to be filed by a losing party who simply disagrees with the decision; otherwise, the Court would be inundated with motions from dissatisfied litigants. A motion requesting the court to alter or amend its judgment must at the very least submit newly discovered evidence or identify manifest errors of law or fact. The Court does not appreciate the filing of a motion under Rule 59(e) which simply rearuges what the party has already put before the Court. The Seventh Circuit has warned litigants against making general allegations without support and explanation; otherwise they

will forfeit their point. *Pelfresne v. Village of Williams Bay,* 917 F.2d 1017, 1023 (7th Cir.1990). The Court need not do the moving party's research. *Id.*

Home State's motion demonstrates an all to often encountered problem for the Court: counsel's apparent disregard for the administration of justice. It is a well accepted principle that an attorney is an officer of the court, and in such capacity, owes the court a duty to protect and defend it from interference in its administration of justice. *Theard v. United States,* 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342 (1957). Because judicial resources are limited, those resources must be protected against wasteful consumption. *Hanson v. Goodwin,* 432 F.Supp. 853, 858 (W.D.Wash. 1977); *see* 28 U.S.C. § 1927; Federal Rule of Bankruptcy Procedure 9011. Frivolous claims and proceedings consume a significant amount of judicial resources, diverting time and energy of the judiciary away from processing good faith claims. *Id.* at 858. If vexatious and unreasonable litigation is allowed to consume the court docket, the courts will have less time to devote to each proceeding, resulting in the lack of adequate time for reflection and a real threat to the quality of justice. *See Franklin v. State of Oregon,* 563 F.Supp. 1310, 1319 (D.Or.1983). As Justice Cardoza so aptly noted while Chief Judge of the New York Court of Appeals, "Membership in the bar is a privilege burdened with conditions." *Matter of Rouss,* 221 N.Y. 81, 116 N.E. 782, 783 (N.Y.Ct.App.1917).

Home State's motion burdens this Court with considering the same issues argued by Home State in its summary judgment motion. Rule 59(e) is to be used to allow the court to correct manifest errors of law or fact, or consider the impact of newly discovered evidence. *Publishers Resource, Inc.,* 762 F.2d at 561. Although the Defendant's cavalier approach fails to even remotely approach the standards set by the Seventh Circuit in granting a motion to alter or amend a judgment, the Court feels compelled to highlight the foibles in Home State's arguments. The Court finds that Home State has failed to submit any newly discovered evidence and has failed to identify any manifest errors made in law or fact.

## B. FACTUAL CONCLUSIONS

Home State contends that the Court based its decision upon unsubstantiated and incorrect factual conclusions. The Defendant argues that it would not have received a windfall of $257,419.80, as the Court observed, even though Home State failed to convey any value to BNT in return for the payment. Home State contends that the release of its interest in Federal's property amounting to approximately $290,000 constituted sufficient value to the BNT estate.

The Defendant mixes apples and oranges. Home State's position is, essentially, that even though it had no right to receive payment from BNT, it did have a right to receive payment from Federal. Thus, the Defendant's release of liens against Federal's property constituted sufficient value given in return for the $257,419.80 transfer. The issue before this Court concerns BNT and whether Home State had a right to receive monies from BNT, not Federal.

The Illinois and Nebraska laws are clear in holding that any attempt to assign a mortgage without the transfer of the underlying debt will not pass the mortgagee's interest to the assignee. *Commercial Products Corporation v. Briegel,* 101 Ill. App.2d 156, 242 N.E.2d 317, 321 (3d Dist. 1968); *Webb v. Hoselton,* 4 Neb. 308, 318 (1876). The purported assignment from Citibank, N.A. to Home State failed to assign the underlying debt; a fact which is undisputed. Thus, the assignment was an assignment of nothing—it was a nullity. *Moore v. Lewis,* 51 Ill.App.3d 388, 9 Ill.Dec. 337, 342, 366 N.E.2d 594, 599 (1st Dist. 1977); *Webb v. Hoselton,* 4 Neb. at 318. Home State had no interest in BNT's property or in the proceeds from the sale of BNT's property.

Whether Home State retained a valid interest in Federal's property fails to change the character of the $257,419.80 payment. *Home State was not a creditor of BNT*

*and had no right to receive the $257,- 419.80 payment.* Any payment made by BNT to Home State for it releasing a non-lien mortgage would constitute a windfall to the Defendant to the extent that it received something ($257,419.80) for nothing (release of a non-lien against BNT's property). Home State from the start and continuing to the present fails to provide any evidence to the contrary.

Home State obfuscates the issue by arguing that its release of various purportedly enforceable interests against Federal's property valued at $290,000 constituted value to BNT. Home State's position is untenable and totally without merit in law and in fact. The Defendant has again failed to provide a single case which remotely supports its position. It was BNT's money that was transferred to Home State, and it must be BNT that receives the consideration from Home State's release of liens, not Federal. Home State has never argued that BNT and Federal are one and the same. Any benefit conveyed to Federal does not automatically translate into a benefit to BNT, a separate and distinct entity, just because Home State's counsel says it. The law and facts are unequivocal; Home State released a non-lien under the laws of the states where the property was located, which did not benefit BNT one iota. Home State in exchange however obtained over a quarter of a million dollars.

Home State next argues that the Court cannot infer a "guilty mind" from the Defendant's receipt of $257,419.80 even though it released a non-lien on BNT's property. The Court made no such inference. Rather, the Court held that the issue of whether Home State willfully violated § 362 will be set for an evidentiary hearing. Home State's attempt to have the Court reconsider this issue is disingenuous. The issue will be decided after an evidentiary hearing.

Home State's claim that the Court's failure to join Federal in this adversary has prejudiced the Defendant, like a majority of its unsupported allegations, barely merits a response. Home State has still failed to carry its burden in showing that Federal is a necessary party to this litigation for the purpose of protecting Home State's right to assert claims against Federal. No new evidence has been presented which persuades this Court to change its prior ruling. The Comfort Order protects Home State's rights, if in fact it ever needed such an order, to raise issues concerning its alleged interest in Federal's property in Federal's separate bankruptcy proceedings, and nothing more need be or should be done at this time.

## C. REINSTATEMENT OF LIENS

■ Home State requests the Court to reinstate its liens against Federal's property which is certainly not an appropriate request in the BNT proceedings. Home State claims to have released all of its purported secured interests and liens upon receiving the payment of $257,419.80 from the sale of BNT's property. Home State relies on the Court's ruling in the Norwest Opinion. *See In re BNT Terminals, Inc.,* 87 A 1232, Memorandum Opinion and Order, October 5, 1989. The findings upon which the Norwest Opinion is based are inapposite to the facts applicable to Home State in this matter.

In *Norwest,* the creditor, Norwest Bank, N.A., had a *valid mortgage on BNT's property and was a creditor of BNT.* Sometime after BNT filed its bankruptcy petition, it sold property subject to Norwest Bank's lien. Norwest Bank was paid in full by BNT from the sale proceeds and Norwest Bank released its lien against the property. The Trustee filed suit against Norwest Bank alleging violations of § 362 and § 549. The Court held that Norwest Bank did not violate § 362. The Court also refused to avoid the transfer under § 549. The Court explained that:

> Inasmuch as Norwest's lien on the Omaha Terminal has been conceded as valid, the voiding of the transfer of the property (Omaha Terminal) would lead to the reinstatement of Norwest's lien and the end result being the restoration of the funds to Norwest. The court declines to make Norwest disgorge the transfer at this time ... This court is not inclined to

engage in wasted efforts. This is not a matter of Bankruptcy policy, as suggested by Norwest, but a matter of economy and common sense.

*Norwest,* 87 A 1232, October 5, 1989, p. 7 and 8.

Thus, the Court let the transfer stand.

■ Home State never held a valid interest in the BNT property sold and had no right to receive funds from BNT. To start with, Norwest Bank was a creditor of BNT and nothing more need be said. It is disingenuous of Home State's attorneys to allege a similarity in these cases. They owe a professional duty to this court not to misstate these matters or force the Court to spend precious time addressing meritless arguments. *See* Federal Rule of Bankruptcy Procedure 9011. The past and present conduct of Home State's attorneys disturbingly demonstrate an apparent mindless abuse of the fundamental duty of attorneys to assist the Court. Their conduct is not appreciated by this Court.

Home State also argues that the Court should reinstate the liens against Federal premised upon "basic concepts of equity." However, equity follows law and Home State's lawyers have failed to articulate what the basic concepts of equity are that the Court should apply, or how the Court can order something accomplished in an entirely different case.

### D. VIOLATION OF THE AUTOMATIC STAY

■ Home State contends that the Court's application of § 362 is erroneous, but the Defendant again fails to submit any new evidence or identify any manifest errors of law or fact. This Court rejects the Defendant's use of the Humpty Dumpty theory of reasoning.[2] Home State must provide more than its own conclusions which this Court has previously addressed in its November Opinion.

It is undisputed that the Seventh Circuit Court of Appeals has warned pre-petition creditors against taking any action to collect their debts lest they be in violation of § 362. *In re Vitreous Steel Products Co.,* 911 F.2d 1223, 1231 (7th Cir.1990). The Seventh Circuit's literal approach comports with the broad scope of § 362 and the majority of the circuits that treat acts in violation of the automatic stay as void ab initio. *In re Calder,* 907 F.2d 953, 956 (10th Cir.1990); *In re Taylor,* 884 F.2d 478, 483 (9th Cir.1989); *In re Smith,* 876 F.2d 524, 525–26 (6th Cir.1989); *In re Ward,* 837 F.2d 124, 126 (3d Cir.1988). Home State requests this Court to make an exception to this well-accepted rule based upon dicta in *In re Garcia,* 109 B.R. 335 (N.D.Ill.1989). The Court adds that although Home State raised this issue in its summary judgment motion, it has argued the issue comprehensively for the first time in the present motion.

The Court has exhaustively explained that the payment violated the automatic stay. In no way does the Court's finding render § 549 a nullity, as the Defendant now claims. It is the proposed application of § 362 by Home State that does an injustice. The Defendant encourages this Court to apply § 549 to avoid the transfer so that the recovery by the Trustee is limited to a single satisfaction under the Trustee's recovery powers of § 550. Why should the Trustee be limited in the amount it recovers from Home State when the Defendant had no right to receive the amount transferred? Nothing in the plain language of § 549 even slightly supports Home State's conclusion that § 549 was intended to allow this type of transfer to stand. Home State has truly visited the Wonderland from where Alice travelled if it believes that it can manipulate the Code provisions so that it may keep what it had no right in originally obtaining. As the Court has repeatedly said, allowing the transfer of $257,419.80

---

2. " 'When I use a word,' Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.'
'The question is,' said Alice, 'whether you can make words mean so many different things.'

'The question is' said Humpty Dumpty 'which is to be master—that's all.' " Lewis Carrol, *Through the Looking Glass,* Chapter 6.

would be a travesty to justice and make a mockery of this Court.

Finally, Home State argues that the $257,419.80 did not constitute property of the estate, but fails to cite new evidence or identify any errors of law or fact. The Defendant's argument is totally without merit, and hopefully will never be made again.

## CONCLUSION

For the reasons outlined above, the Court finds that Home State has failed to offer any new facts or identify any manifest errors of law or fact to support its request to this Court to alter or amend its November Opinion, November Order, or the Comfort Order. Home State's motion is therefore denied.